USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: _9/30/2020_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMIRAH A. BLACKMAN,

                                        Plaintiff,

              -against-

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

1:19-cv-3226 (ALC)

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Amirah Blackman ("Plaintiff" or "Ms. Blackman") brings this action, *pro se*, challenging the final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") that Ms. Blackman was not disabled for the purposes of entitlement to Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (hereinafter, the "Act"). Currently pending is the Commissioner's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons set forth below, the Commissioner's motion is hereby **GRANTED**.

## BACKGROUND[1]

### I.    Procedural Background

Ms. Blackman first applied for SSI Benefits on April 20, 2011 ("April 2011 Application"). R. at 99–105. She filed another application for SSI Benefits, as well as an application for DIB, on September 19, 2012 ("September 2012 Application"). *Id.* at 431. Ms. Blackman's April 2011 Application was denied by an Administrative Law Judge on December 14, 2011. *Id.* at 6–21. She appealed this decision and the Appeals Council denied review. *Id.* at 1–3. A court in this District

---

[1] "R" refers to the Certified Administrative Record. ECF No. 9. Pagination follows the original pagination in the Certified Administrative Record.

remanded the case for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g). *See* Stipulation and Order (ECF No. 17), *Blackman v. Comm'r of Soc. Sec.*, No. 12-CV-3901 (S.D.N.Y. Feb. 12, 2013). On May 3, 2013, after remand from the District Court, the Appeals Council vacated the final decision of the Commissioner of Social Security; associated Plaintiff's claims that were filed on September 19, 2012 with her claims filed on April 20, 2011; and remanded the case to an Administrative Law Judge for a *de novo* hearing on the associated claims. R. at 621–23.

On remand, the Administrative Law Judge held a hearing and concluded that, based on Ms. Blackman's April 2011 Application, she was not disabled under section 1614(a)(3)(A), and accordingly denied her SSI application on August 15, 2014. R. at 648–59. However, on February 6, 2015, the Appeals Council again remanded the case for further proceedings because the Administrative Law Judge's August 15, 2014 decision erroneously did not consider Ms. Blackman's September 2012 Application. *See* Order of Appeals Council (R. at 667) ("[U]pon remand, the Administrative Law Judge's hearing decision does not discuss the claimant's subsequent application and does not discuss the evidence contained in the subsequent application's record.").

After a hearing on June 30, 2015, an Administrative Law Judge issued a decision on February 24, 2016 denying Ms. Blackman's April 2011 Application and her September 2012 Application. R. at 700–13. On May 2, 2016, the Appeals Council again remanded the case to the Administrative Law Judge for resolution of issues including a further evaluation of Plaintiff's learning disorder (with appropriate intelligence testing) and a further evaluation of opinion evidence of psychological consultants and other experts as to Plaintiff's mental limitations. *Id.* at 725–28. Finally, after another hearing on July 25, 2017, an Administrative Law Judge denied Ms.

Blackman's April 2011 Application and her September 2012 Application on January 31, 2018. R. at 431–54.  Ms. Blackman requested review of by the Appeals Council—a request that was denied on February 15, 2019. R. at 416–421.

Accordingly, Plaintiff filed a Request to Proceed In Forma Pauperis and a Complaint ("Compl.") on April 10, 2019. ECF Nos. 1–2.  The Court granted Plaintiff's request on April 11, 2019. ECF No. 4.  Defendant filed the SSA Administrative Record on July 15, 2019. ECF No. 9. Defendant filed a motion for judgment on the pleadings on September 12, 2019. ECF Nos. 15–16. Plaintiff filed an opposition on November 13, 2019. ECF No. 18.  Finally, Defendant filed a reply on December 3, 2019. ECF No. 19.  Defendant's motion is deemed fully briefed.

## II.    Factual Background

### A.  Plaintiff's Background

Plaintiff was born on May 7, 1986. R. at 11.  She completed an eleventh grade education and has briefly worked as a cashier for a pharmacy, a supermarket, and a department story. *Id.* at 29–32, 121.  Some of her cashier jobs, including at Shoprite from 2003–2004 involved her standing on her feet for up to eight hours a day and frequently lifting 50 pounds or more per day. *Id.* at 154. Plaintiff also worked part-time as a child care worker during which she would babysit children. *Id.* at 32, 485–86.  While babysitting, she would help the children with their homework, clean up the house, made dinner, and perform other household tasks. *Id.* at 486–88.  Finally, Plaintiff worked for a security company and would stay in a booth and monitor and maintain entrance of busses. *Id.* at 523.  She never received her GED, *id.* at 29, though she has worked as part of a program to obtain her GED and has also received a license to serve as a security guard, *id.* at 29–30.

At the time of the hearing on June 30, 2015, her son was six and a half years old, regularly attended school, and Plaintiff was his primary caretaker. *Id.* at 540.  However, at the time of her

psychiatric evaluation on November 30, 2016, the child was living with his father. *Id.* at 2005. Plaintiff does occasionally exercise and does all of the shopping, cooking, and cleaning in her home. *Id.* at 548.  Plaintiff attends a religious service to pray and has previously described her hobbies as including reading, singing, and listening to the radio. *Id*. at 145; *see also id.* at 2007. She has family that she sees occasionally and that comes over to her home though she is not social with any friends. *Id.*  Her son received supplemental security income because of his disability, though the money was given to the son's father as the legal custodian of the child. *Id.* at 28–29, 41.  The son received this assistance because he was born with a hand cleft on his left hand. *Id.* at 41.  Though he has a split in his hand and lacks a middle finger digit, he is able to fully walk, run, write, and function normally. *Id.*

B. **Plaintiff's Alleged Disabilities and Symptoms**

Plaintiff was in an abusive relationship with her son's father and they engaged in a lengthy custody battle. *Id.* at 37.  She alleges that she suffers from depression and anxiety, in part due to her abusive relationship, and received psychiatric and psychological treatment for these issues. *Id.* Plaintiff notes that her depression and anxiety have kept her from pursuing hobbies and from exercising, *id.* at 43–44, that she does not "feel comfortable around people," *id.* at 35, and that she often feels sad and nervous, *id*.  In November 2016, Plaintiff reported that she "feels depressed most days" and that she reported "difficulty sleeping, some crying spells, fatigue, and loss of energy." *Id.* at 2005.  For her depression and anxiety, Plaintiff took Zoloft and Klonopin. *Id.* at 38. These symptoms began in June 2009 and she has had to check herself into the emergency room several times for panic attacks trigged by her son's father and other stressors. *Id.* at 549–50. Plaintiff claims that because of her disabilities, she would not be able to keep a job because "I'm just lost" and because she is not able to "focus around people." *Id.* at 556.

Plaintiff also has hearing loss, and has had trouble hearing all of her life because of two different ear deformities. *Id.* at 35. Specifically, she alleges that her "hearing was just fading away" and that it was "difficult for [her] to hear." *Id.* at 36–37. She received surgery for this issue in May 2011 at St. John's Medical Center, and the surgery improved her hearing and she was happy with the result of the surgery. *Id.* at 35–37. At the surgery, "they put tubes in [Plaintiff's] ears" and afterwards she reported that her hearing condition was "better now," though she reported that "sometimes it bugs me out." *Id.* at 557–58. Plaintiff has testified that "sometimes I can hear close by; sometimes it's too loud." *Id.* at 583.

### C. **Evidence of Medical Treatment in the Record**

i.   Medical Evidence of Physical Condition

Plaintiff's primary physical ailment is her hearing loss. In October 2009, Plaintiff visited Dr. Jeffrey Cousin, an ENT specialist at ENT Allergy Associates, where she complained about chronic nasal congestion, mouth breathing, a history of ear infections, and moderate-severe hearing loss. *Id.* at 285. Examinations revealed that she had mild to moderately severe conductive hearing loss in her right ear and mild conductive hearing loss in her left ear. *Id.* at 289. Dr. Cousin also performed a procedure to removed impacted cerumen from both of Plaintiff's ears. Plaintiff had a follow-up appointment with Dr. Cousin in December 2009 at which she reported that her symptoms had not changed. *Id.* at 389. Accordingly, Dr. Cousin recommended that Plaintiff undergo a bilateral myringotomy with tympanostomy tubes procedure. *Id.* at 400. In April 2011, Plaintiff had another visit with Dr. Cousin where she complained that conversations were difficult to understand, that she had ear pain, tinnitus, and pressure in her ears, and that tones sounded different in her good and bad ears.

Finally, on May 24, 2011, Plaintiff had a bilateral myringotomy with tympanostomy tube placement. *Id.* at 250–51.  After her procedure, she had a follow-up appointment in September 2011 with Dr. Cousin at which she reported that her hearing was "much better." *Id.* at 386.  In September 2011, Plaintiff also had an x-ray of her temporomandibular joints which showed that her right temporal mandibular joint was normal though there was limited evaluation of the left temporomandibular joint. *Id.* at 1284.

ii.    Medical Evidence of Psychological Condition

In May 2010, Plaintiff was evaluated at Westchester County Department of Community Mental Health when she complained about depressive symptoms resulting from losing custody of her son. *Id.* at 307.  At the time, she had no prior history of inpatient or outpatient mental health treatment, and she had completed a rehabilitation treatment program at the Positive Direction Center for marijuana addiction. *Id.* at 307.  An exam revealed that Plaintiff had suffered emotional and physical trauma, as well as domestic violence; that she exhibited normal intellect, judgment, attention, and thought process; and that she exhibited ideas of excessive guilt and hopelessness. *Id.* at 310-11.  She was diagnosed with depressive disorder, impulse control, adjustment disorder, and cannabis abuse, and she was assessed with a Global Assessment of Functioning score of 45. *Id.* at 314.

In March 2011, Plaintiff underwent an evaluation at the Westchester Jewish Community Services ("WJCS") after reporting she was depressed for the past year since she lost custody of her son. *Id.* at 323.  Specifically, Plaintiff noted that she had supervised visits with her son, but that she was worried that her son's father was putting thoughts in his head because her son would call her "nanny," "stupid," and "dumb." *Id.*  Plaintiff reported having difficulty sleeping and

having no appetite. *Id.* at 329.  A mental status assessment revealed that Plaintiff was anxious and depressed, but had good insight, thought process, and judgment.

In April 2011, Plaintiff had another evaluation at WJCS after she reported that she was depressed, self-recriminatory, had low self-esteem, could not sleep, and cried for hours every day. *Id.* at 317.  After a mental status examination, it was determined that she is "very depressed and pines for her son." *Id.* at 319.  The examination also revealed that Plaintiff was sad, anxious, and hypoactive; and that Plaintiff had normal concentration, insight, and judgment. *Id.*  At that time, Plaintiff was diagnosed with adjustment disorder and moderate depression prescribed Zoloft and Klonopin for anxiety and depression. *Id.* at 320-22.

In November 2011, Plaintiff had another evaluation at WJCS because "she has been under considerable stress and feels that she has been mentally abused by her son's father." *Id.* at 1326. Plaintiff also reported that she had difficulty falling and staying asleep and that she feared her son's father. *Id.*  Her assessment revealed that she responded partially to Zoloft but had not continued with Klonopin because she had not seen a psychiatrist since 2011. *Id.* 1326.  Dr. Kenneth Kessler put in place a plan for Plaintiff to continue Zoloft and restart Klonopin. *Id.* at 1326.  In January 2012 Plaintiff returned for a follow-up visit and was "somewhat less anxious and somewhat depressed," though she still had difficulty falling and staying asleep and was still scared of her son's father. *Id.* at 1323.  Plaintiff reported that she was "able to go back to working out at the gym which has been helpful." *Id.*  Similarly, in follow-up visits in March, April, June, and July, and November of 2012, Plaintiff reported that she was "less anxious and depressed," that she had "less difficulty falling asleep," *id.* at 1321, and that she was back to working out at the gym, *id.* at 1315. She continued to take Zoloft and Klonopin after each of these visits, though in late July she reported that she "only needed to take Klonopin 2 or 3 times a week." *Id.* at 1313.  In a follow-up

appointment in May 2013, Plaintiff reported that she lived with her five year old son in Peekskill and that she has "limited social interaction with peers" but was "close to her family, who live nearby and help with her son." *Id.* at 1233.  At this appointment, a mental status exam indicated that Plaintiff felt anxious and depressed, but that she was in the normal range for affect, speech, memory, insight, and judgment. *Id.* at 1235-36.

In April 2014, Plaintiff went to the emergency department at Vassar Brothers Medical Center complaining of an anxiety attack that onset four days earlier and that had worsening symptoms. *Id.* at 1750.  She was administered and prescribed Klonopin. *Id.* 1754.  Plaintiff also walked into Dutchess County Mental Hygiene presenting with depression and anxiety. *Id.* at 1362. She was prescribed Lurasidone to make her feel less nervous and improve her mood. *Id.* at 1263-64.  In May 2014, Plaintiff had an appointment at Hudson Valley Mental Health, where she was diagnosed with adjustment disorder and major depression, and felt "overwhelmed, insomnia, anxiety, difficulty relaxing, sad mood [], weight fluctuation, [and a] lack of energy." *Id.* at 2015. At that appointment Plaintiff was assessed with a GAF score of 47. *Id.* at 2020.  In September 2014, Plaintiff went to St. Joseph's Hospital to complain about anxiety and that she ran out of her Zoloft and Klonopin. *Id.* at 1988.  She was administered one dose of Klonopin. *Id.* at 1993.  In December 2014 and May 2015, Plaintiff returned to Hudson Valley Mental Health, where she presented with symptoms of depression, anxiety, and panic attacks. *Id.* at 2023-38.

In May 2015, Plaintiff went to the emergency department at Vassar Brothers Medical Center three times complaining about anxiety and dehydration, *id.* at 1407, of anxiety, *id.* at 1482, and of anxiety and harassment (including difficulty sleeping, dizziness, tingling in extremities), *id.* at 1497.  In August 2015, Plaintiff returned to Hudson Valley Mental Health after her case was closed because she stopped coming in for treatment and she did not respond to a letter about her

treatment. *Id.* at 2039.  Plaintiff reported that she needed to re-enter therapy and that she continued to have depression symptoms, including trouble sleeping, feeling tired, feeling bad about herself, and a fluctuating appetite. *Id.*  She also reported that she enjoyed reading books, writing music, spending time with her son, shopping, cooking, and cleaning, and had signed up to obtain her GED. *Id.* at 2041.  In October 2015, Plaintiff again returned to Hudson Valley Mental Health where she was stressed by attending school, family issues, and legal issues with her son's father. *Id.* at 2047.  A mental status assessment revealed that her insight and judgment was fair and that her intelligence was average to low average. *Id.* at 2048.

In July 2016, Plaintiff received treatment at the Westchester Medical Center where she complained about increased anxiety since moving in with her father and given conflicts with her previous landlord. *Id.* at 2071.  Plaintiff was assessed to have "increased anxiety in the context of multiple psychosocial stressors, including financial, housing, occupational." *Id.* at 2075.  At that time, Plaintiff had reportedly been off her medicines—Zoloft and Klonopin—for several months and requested medications for her anxiety. *Id.* at 2071.  In August 2016, Plaintiff reported that her life had been "stressful" and that she had an order of protection against her from her husband. *Id.* at 2079. Plaintiff also reported that she has "not required use of medications to cope with anxiety" and denied having panic attacks. *Id.* at 2079.  Similarly, in September 2016, Plaintiff reported that her anxiety had been mostly stable and that her stressors are slowly being resolved, which improved her anxiety. *Id.* at 2082.  In November 2016, Plaintiff again reported that "she was doing fine," that she recently moved to Connecticut, that her mood has been stable, and that her anxiety has been intermittent and minimal. *Id.* at 2085.  Plaintiff's physician, Dr. Moead Ahmad, did note that Plaintiff repeatedly stated that she could not work, but that Plaintiff was not deemed to be unable to work at that time. *Id.* at 2086.  In December 2016, Plaintiff reported intermittent mild

anxiety but described her anxiety as intermittent and mild. *Id.* at 2087.  Plaintiff continued to stress that she could not work at the moment in light of the stressors she is going through. *Id.*  At this time, Plaintiff was again prescribed Zoloft. *Id.* at 2088.  Also in December 2016, Plaintiff presented to request to have her social security paperwork completed as "she feels she is unable to work at the present time due to her mental health which she claims causes her severe distress and limits her ability to function optimally, especially in situations of high stress." *Id.* at 2091.  Plaintiff was prescribed Trazodone and continued on Zoloft. *Id.* at 2092.  In February 2017 and March 2017, Plaintiff noted that she was very stressed about rent and her financial difficulties, but noted that things were generally going well and that she was able to maintain her daily activities. *Id.* at 2095, 2097.  Finally, Plaintiff was seen in July 2017 at the Family Intervention Center where she was diagnosed with major depression and panic attacks. *Id.* at 2103.

    D. **Medical Opinions**

      i. **Dr. Catherine Pelczar-Wissner – Internal Medicine Consultative Exam**

On June 16, 2011, Dr. Pelczar-Wissner examined Plaintiff after she was referred by the Division of Disability Determination for an internal medicine examination. R. at 236.  Plaintiff complained to Dr. Pelczar-Wisner that after having surgery on both ears, she was having occasional dizziness. *Id.*  Plaintiff also reported that she had major depression and saw a psychiatrist and therapist at St. John's Medical Clinic in Yonkers. *Id.*  Finally, Plaintiff reported that she "does her cooking and cleaning" and that she "likes to read."  After examination, Dr. Pelczar-Wissner noted that Plaintiff could not hear whispered voice in either ear within five feet. *Id.* at 237.  Dr. Pelczar-Wissner diagnosed Plaintiff with (1) status post bilateral ear surgery and (2) depression; and noted that Plaintiff "cannot participate in activities requiring normal binaural hearing." *Id.* at 238.

ii.   **Dr. John Laurence Miller – Psychiatric Evaluation**

On July 6, 2011, Dr. Miller examined Plaintiff during a psychiatric evaluation.  Plaintiff reported to Dr. Miller that she was in significant pain after her ear surgery. *Id.* at 252.  Plaintiff also reported that she had difficulty falling asleep, loss of appetite, and significant stress related to her ear surgery and custody battles concerning her son. *Id.*at 252.  She also reported depressive symptoms including dysphoric moods, crying spells, irritability, social withdrawal, and concentration difficulties. *Id.* at 253.   She also reported anxiety-related symptoms including nightmares, flashbacks, and fearfulness of losing custody of her son. *Id.*  Plaintiff reported that she "dresses, bathes and grooms herself, cooks, prepares food, cleans, does laundry, shops, drives and takes public transportation." *Id.* at 254.   She reported "having no friends" and "no hobbies or interest," though she "spends her day reading and listening to the radio." *Id.*

Dr. Miller's exam revealed the following about Plaintiff's vocational functional capacities:

> The claimant can follow and understand simple directions and instructions. She can perform simple tasks independently. She appears to have trouble maintaining attention and concentration. She would probably have difficulty maintaining a regular schedule because of her childcare responsibilities. She may have trouble learning new tasks and performing complex tasks independently. She does not appear able to make appropriate decisions consistently. She also appears to have at least some difficulty relating adequately with others and dealing appropriately with stress. Difficulties appear to be caused by suspected cognitive deficits, psychiatric problems and a lack of motivation. The results of the examination appear to the be consistent with psychiatric problems but these do not appear to be significant enough to interfere with the claimant's ability to function on a daily basis."

*Id.* at 255.   Putting this together, Dr. Miller diagnosed Plaintiff with (1) post-traumatic stress disorder; (2) personality disorder; and (3) hearing loss. *Id.*

iii.   **Dr. T. Harding – Assessment of Reviewing Psychologist**

On July 13, 2011, Dr. T. Harding reviewed the record and synthesized it to note that Plaintiff had anxiety-related disorders and personality disorders. *Id.*at 256.   Specifically, he noted

that Plaintiff had PTSD and had personality disorder. *Id.* at 263.  Dr. Harding stated that Plaintiff

had moderate restriction of activities of daily living, moderate difficulties in maintaining social

functioning, and moderate difficulties maintaining concentration, persistence, or pace. *Id.* at 266.

After examining her records, Dr. Harding concluded that "claimant's only physical limitation is

due to her decreased hearing and she therefore should be limited to working around hazards. The

MER in file regarding her mental limitations supports that she is able to do simple work." *Id.* at

275.  Dr. Harding also found that Plaintiffs' "statements are found to be credible but not to the

extent that she alleges as she is able to do her own [activities of daily living], cleaning, cooking,

laundry, shopping, and care for her son when she has him. . . . The claimant retains the mental

capacity for simple work." *Id.* at 278.

### iv.   **Dr. Michelle Marks – Assessment of Reviewing Psychologist**

On November 15, 2012, Dr. Marks reviewed the record and synthesized it to note that

despite trouble with concentration and psychological symptoms, Plaintiff was able to sustain

attention adequately to complete routine tasks and sustain an ordinary work schedule over time.

*Id.* at 693.  Dr. Marks also noted that Plaintiff had trouble with memory on examination, but that

Plaintiff had "worked as a security guard" and was "in outpatient treatment with no indication of

significant difficulty of memory." *Id.* at 692.  Finally, Dr. Marks noted that Plaintiff was "under

stress, having difficulty coping but is engaged in outpatient treatment" and "retains the capacity to

deal with routine changes in an ordinary work setting." *Id.* 694.

### v.   **Elizabeth Bergman – Medical Source Statement**

On November 10, 2011, licensed clinical social worker, Ms. Bergman, completed a

medical source statement of ability to do work-related activities.  Ms. Bergman noted that Plaintiff

"has been suffering with depression and anxiety which makes it difficult to focus on daily tasks,"

and that "Ms. Blackman has anxiety about being around people." *Id.* at 413-14.  Ms. Bergman also noted that Plaintiff has moderate impairments in the ability to make judgments on complex work-related decisions and moderate impairment on the ability to carry out complex instructions. *Id.* at 413.  However, Ms. Bergman also noted that Plaintiff only had mild impairments in the ability to "understand and remember simple instructions," "carry out simple instructions," and "make judgments on simple work-related decisions."   Finally, Ms. Bergman noted that Plaintiff had moderate impairment in interacting appropriately with co-workers, the public, or supervisors." *Id.* at 414.

### vi.   **Dr. Alan Dubro – Psychological and Intellectual Assessment**

On August 21, 2012, Dr. Alan Durbo conducted a psychological and intellectual assessment of Plaintiff for determination of employability. *Id.* at 1347.  Plaintiff reported last having worked four years prior as a security guard, that she was relatively withdrawn from society, experiences difficulty dealing with day-to-day stress, and often felt anxious in social settings. *Id.* at 1347.  Dr. Durbo noted that Plaintiff was "depressed and anxious during the exam" and that she had "impaired secondary to distractibility associated with a depressed and anxious mood which was evident when the client was asked to perform these tasks." *Id.* at 1349.  Dr. Durbo diagnosed Plaintiff with dysthymic disorder, generalized anxiety disorder, and learning disorder, and assessed Plaintiff with a GAF score of 55. *Id.* at 1350.  Dr. Durbo's examination revealed that Plaintiff had normal thought process, orientation, insight and judgment; but that she had abnormal mood, affect, attention and concentration, recent and remote memory skills, and cognitive functioning. *Id.* at 1348-49.  Finally, Dr. Durbo concluded that Plaintiff was capable of following, understanding, and remembering simple instructions and directions, that she had the ability to use public transportation, and that she was capable of low stress and simple tasks. *Id.* at 1350.  However, he

noted that Plaintiff was moderately limited (i.e., unable to function 50% of the time) in her ability to perform complex tasks independently, in her ability to maintain attention and concentration for rote tasks, and in her capability of regularly attending to a routine and maintain a schedule. *Id.* at 1350. Dr. Durbo checked the box recommending SSI because "Individual appears permanently disabled, condition is not expected to improve, and is unable to participate in any activities." *Id.* at 1351.

### vii.     **Dr. Alan Durbo – Psychiatric Consultative Exam**

On November 8, 2012, Dr. Durbo conducted a psychiatric evaluation of Plaintiff. Plaintiff reported that she resided with her son in Peekskill, New York and that she last worked in 2008 as a security guard. *Id.* at 1354. Plaintiff also reported that she has "experienced longstanding difficulties in dealing with day-to-day stress," that she has had depression for many years, and that she has felt more markedly depressed over the past year. *Id.* at 1355. Plaintiff reported that she "experiences limited to no interest in participating in day-to-day activities." *Id.* Indeed, she reported that she has not been consistently motivated to get up and out of bed in the morning, that she loses interest in simple tasks and does not complete them, and that she has not been motivated to perform chores outside of her home. *Id.* at 1356.

Dr. Durbo's examination revealed that Plaintiff's attention and concentration, her recent and remote memory skills, and her cognitive functioning were all impaired. *Id.* at 1356. Dr. Durbo noted that Plaintiff's general fund of information is lower than expected, given her estimated cognitive functioning. *Id.* Finally, Dr. Durbo made the following assessment:

> The claimant can understand directions and instructions. The claimant displays moderate difficulty in her ability to attend, remember, and follow directions and instructions. The claimant's attention span and concentration are markedly impaired. The claimant is seen as an individual who would experience marked difficulty in learning new tasks. The claimant displays moderate difficulty in her ability to perform daily tasks independently and on a regular basis. She does display

> marked difficulty in her ability to perform complex tasks independently and on a regular basis. She is displaying marked difficulty in her ability to interact with others. She is displaying a great deal of difficulty in her ability to make day-to-day decisions. The claimant is seen as an individual who would display marked difficulty in her ability to regularly attend to a routine and maintain a scheduled.
>
> The results of the examination are consistent with psychiatric problems which significantly interfere with the claimant's ability to function on a daily basis.

*Id.* at 1357.  Putting this together, Dr. Durbo diagnosed Plaintiff with major depression and a learning disability. *Id.*

### viii.   **Elizabeth Bergman – Physician's Report for Claim of Disability**

Ms. Bergman completed another assessment of Plaintiff on April 2, 2013.  Plaintiff reported depression, including crying, loss of interest in activities, difficulty sleeping, low self-esteem, and anxiety. *Id.* at 1248.  Ms. Bergman noted that Plaintiff was "anxious, irritable, and depressed," but that her thought process was "goal directed, logical, and coherent." *Id.* at 1249. Ms. Bergman diagnosed Plaintiff with depressive disorder and assessed her with a GAF score of 52. *Id.*  Finally, Ms. Bergman noted that Plaintiff had difficulty focusing and following through with various tasks and appointments, and that Plaintiff had low energy and motivation to be socially active. *Id.* at 1254.  However, Plaintiff did not have marked restrictions of activities of daily life and Plaintiff could travel alone on a daily basis by bus and subway. *Id.* at 1254-55.

### ix.   **Dr. Melissa Antiaris – Psychiatric Consultative Exam**

On November 30, 2016, Dr. Antiaris conducted a psychiatric exam of Plaintiff.  Plaintiff reported that she stopped working and could not work because of depression and anxiety, and that she had difficulty falling asleep, that she feels depressed most days, that she feels overwhelmed, and that she is always on edge and very restless. *Id.* at 2005-2006.  Plaintiff also reported panic attacks that occurred every day. *Id.* at 2006.  Dr. Antiaris' examination concluded that Plaintiff's

thought processes were coherent and goal directed, that her affect was dysphoric, that her mood was dysthymic, that her attention and concentration were mildly impaired due to limited intellectual functioning, and that her cognitive functioning was below average/borderline. *Id.*at 2007. Plaintiff was able to dress, bathe, and groom herself, and was able to cook, clean, complete laundry, and shop. *Id.* Plaintiff was not, however, social with friends. *Id.* She enjoyed listening to the radio and reading. *Id.* at 2007. Dr. Antiaris diagnosed Plaintiff with unspecified depressive disorder and unspecified anxiety disorder. *Id.* at 2008. Finally, Dr. Antiaris' medical source statement was:

> There are no limitations in the claimant's ability to follow and understand simple directions and instructions, or perform simple tasks independently. She is mildly limited in her ability to maintain attention, concentration, and a regular schedule. She is mildly limited in her ability to learn new tasks and perform complex tasks independently. She does require supervision. She is mildly limited in her ability to make appropriate decisions and relate adequately with others, and moderately limited in her ability to appropriately deal with stress. Difficulties are caused by lack of motivation.
>
> The results of the examination appear to be consistent with some psychiatric concerns, but in itself, does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis.

*Id.* at 2008.

x.  **Dr. Melissa Antiaris – Intelligence Consultative Exam**

Finally, on November 30, 2016, Dr. Antiaris conducted an intelligence evaluation of Plaintiff. She administered a standardized intelligence test: the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV). This examination revealed that Plaintiff had a full scale IQ of 63, with a verbal comprehension index of 74, a perceptual reasoning index of 69, a working memory index of 77, and a processing speed index of 53. *Id.* at 2011. Dr. Antiaris noted that Plaintiff's "Full Scale IQ of 63 places her in the extremely low range." *Id.* at 2012. However, Dr. Antiaris warned that Plaintiff's IQ score "should be considered with caution" because Plaintiff was not compliant

with all of the directions. *Id.*  Dr. Antiaris diagnosed Plaintiff with unspecified depressive disorder, unspecified anxiety disorder, and borderline intellectual functioning. *Id.* at 2013.  However, Dr. Antiaris noted that "[t]he results of the examination appear to be consistent with some psychiatric concerns, but in itself, does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." *Id.*

## STANDARD OF REVIEW

### I.   **Judicial Review of the Commissioner's Decision**

A district court reviews a Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard. *Talavera v. Astue*, 697 F.3d 145, 151 (2d Cir. 2012).  "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).

The substantial evidence standard means that once an ALJ finds facts, a district court can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault v. SSA*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).  In other words, this Court must afford the Commissioner's determination considerable deference, and may not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal quotation marks and citation omitted). Thus, if a court finds a determination to be supported by substantial evidence, it "must be upheld." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013).

### II.   **Commissioner's Determination of Disability**

A. *Definition of Disability*

A disability, as defined by the Social Security Act, is one that renders a person unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) *accord* 42 U.S.C. § 1382c(a)(3)(A); *see* R. at 10. Further, "[t]he impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000) (quoting 42 U.S.C. § 423(d)(2)(A)).

B. *The Commissioner's Five-Step Analysis of Disability Claims*

The Commissioner uses a five-step process to determine whether a claimant has a disability within the meaning of the Social Security Act. *Selian,* 708 F.3d at 417; *see* 20 C.F.R. §§ 404.1520.

> "First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers from such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled … Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform."

*Selian*, 708 F.3d at 417-18 (citing *Talavera*, 697 F.3d at 151; 20 C.F.R. § 404.1520).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and 'bears the burden of proving his or her case at steps one through four.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). At step five,

however, "the burden shifts to the Commissioner to show that there [are] a significant number of jobs in the national economy that [the claimant] could perform based on his residual functional capacity, age, education, and prior vocational experience." *Butts v. Barnhart*, 388 F.3d 377, 381 (2d Cir. 2004) (citing 20 C.F.R. § 404.1560); *see Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

### C.  **The Decision of the Administrative Law Judge**

As noted above, the ALJ issued a final decision denying Ms. Blackman's April 2011 Application and her September 2012 Application on January 31, 2018. R. at 431–54.  The ALJ concluded that Plaintiff had severe impairments, including major depressive disorder, anxiety learning disorder, posttraumatic stress disorder, panic disorder, and hearing loss. *Id.* at 437.  The ALJ noted that these impairments "significantly limit the ability to perform basic work activities." *Id.*  Specifically, the ALJ concluded that Plaintiff has the residual functional capacity to perform a full range of work, but was limited by the following limitations: Plaintiff can "understand remember and carryout simple work and adapt to routine workplace changes, and can occasionally interact with supervisors coworkers and the general public and can only work in areas where there is moderate noise level such as business offices, department stores, grocery stores and light traffic. *Id.* at 441.  In light of these limitations, and considering Plaintiff's "age, education, work experience, and residual functional capacity," the ALJ identified at least four unskilled jobs that Plaintiff was able to perform: cleaner housekeeping, cleaner commercial, cleaner floor waxer, and cleaner wall.  In sum, the ALJ concluded that Plaintiff was not disabled between June 1, 2009 and the date of the decision, January 31, 2018. *Id.* at 453.

### DISCUSSION

Ms. Blackman, representing herself *pro se*, objects generally to Defendant's conclusions and asserts that Defendant improperly arrived at the conclusion that she was not disabled.

Specifically, she objects to the determination by the ALJ that she had the residual functional capacity to perform some work with limitations. As a *pro se* litigant, the Court construes Plaintiff's briefs to raise the best argument they suggest. *See Weixel v. Board of Educ.*, 287 F.3d 138, 145-46 (2d Cir. 2002). After a thorough review of the record and the underlying facts, the Court concludes that the ALJ decision regarding Plaintiff's residual functional capacity was supported by substantial evidence and was not legally erroneous.[2]

I.   **Residual Functional Capacity**

The Court concludes that the ALJ's residual functional capacity determination was supported by substantial evidence. The ALJ found that Plaintiff "has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: can understand remember and carryout simple work and adapt to routine workplace changes, and can occasionally interact with supervisors coworkers and the general public and can only work in areas where there is a moderate noise level such as business offices, department stores, grocery stores and light traffic." R at 441.

---

[2] Plaintiff does not challenge steps one through three of the disability analysis. Moreover, to the extent she did, the Court has reviewed the record and agrees with the ALJ that Plaintiff had not engaged in substantial gainful activity because her employment history—garnered from her earning records and testimony—indicates that her earnings were less than the required monthly thresholds for these years. *See* 20 C.F.R. § 404.1574(a)(i) ("Generally, in evaluating [a claimant's] work activity for substantial gainful activity purposes, [the] primary consideration will be the earnings [the claimant] derive[s] from the work activity."); *see also* R. at 436-37. The Court also agrees with the ALJs determination that Plaintiff has severe impairments, including major depressive disorder, anxiety learning disorder, posttraumatic stress disorder, panic disorder, and hearing loss. R at 437; 20 C.F.R. § 404.1520(c) (noting that a severe impairment "limits your physical or mental ability to do basic work activities"). Next, at step three, the ALJ correctly concluded that Plaintiffs' severe impairments did not meet or equal a listed impairment (i.e., that Plaintiff's hearing impairment does not meet the requirements of listing 2.07, 2.08, or 2.10; and Plaintiff's mental impairment did not meet or medically equal the criteria of listings 12.03, 12.04, 12.05, 12.11, or 12.06.

The RFC is an assessment of the most [the claimant] can still do despite [his or her] limitations," 20 C.F.R. § 404.1545(a)(1) and is assessed using "all the relevant evidence in [the] case record." *Id; see also Tankisi v. Commr. of Social Sec.*, 521 Fed. App'x 29, 33 (2d Cir. 2013) (internal quotations omitted).  An ALJ is "entitled to weigh all of the evidence available to make a residual functional capacity finding that was consistent with the record as a whole," and his opinion does not need to "perfectly correspond with any of the opinions of medical sources cited in his decision." *Matta v. Astrue*, 508 Fed. App'x. 53, 56 (2d Cir. 2013).  "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014).

"An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability." 42 U.S.C. § 423(d)(5)(A).  Instead, the ALJ must follow a two-step process in which it first determines whether the medical evidence shows any impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Id.*  Second, if an impairment is shown, the ALJ must evaluate the "intensity, persistence, or functionally limiting effects" of a claimant's pain or symptoms to determine the extent to which they limit a claimant's capacity to work. 20 C.F.R. § 404.1529(b). "If the objective medical evidence alone does not substantiate the claimant's statements about the intensity, persistence, or functionally limiting effects of her symptoms, the ALJ must assess the credibility of the claimant's statements based upon consideration of the case record as a whole." *Burch v. Commr. of Soc. Sec.*, 15-CV-9350, 2017 WL 1184294, at *11 (S.D.N.Y. Mar. 29, 2017).

At the outset, the Court notes that the ALJ conducted a detailed review of the extensive medical record in this case, including medical evaluations from ten different medical professionals, records from at least eight hospitals or health centers, and multiple transcripts from hearings before

Administrative Law Judges. *See* R. at 442-449.  The Court only briefly addresses the relevant evidence below to the extent it is necessary to conclude that a reasonable factfinder could agree with the ALJ's conclusions.

A.  **Physical RFC**

Ms. Blackman claims that she has hearing loss and has had trouble hearing all of her life because of ear deformities. R. at 35.  She received surgery—a bilateral myringotomy with tympanostomy tube placement—for this issue in May 2011 at St. John's Medical Center. R at 250-51.  After the surgery, Plaintiff testified that her hearing condition was "better now," though "sometimes it's too loud." R. at 583.  Moreover, in a follow-up appointment with Dr. Jeffrey Cousin, an ENT specialist at ENT Allergy Associates, Plaintiff noted that after her surgery her hearing was "much better." *Id.* at 386.  In June 2011, also after her surgery, Dr. Catherine Pelczar-Wissner conducted an evaluation of Plaintiff and noted that she could not hear whispered voices in either ear within five feet. *Id.* at 237.  Dr. T. Harding also conducted an assessment of Plaintiff at which he noted that "claimant's only physical limitation is due to her decreased hearing and she therefore should be limited to working around hazards." *Id.* at 275.  Finally, Plaintiff's medical records after 2011 show little evidence of complaints of hearing loss or further evaluations and treatment.  Indeed, at a hearing on July 30, 2015, Plaintiff noted that her hearing problem was "better now," and that the lingering symptom she had was that if she was in a nosier place it "sometimes [] bugs me out." R at 557-58.  When specifically asked whether Plaintiff had any difficulty hearing people, Plaintiff said "no."

This evidence supports the ALJ's conclusion that following Plaintiff's surgery in 2011 her hearing improved significantly to the point where "the objective evidence fails to show any significant communication deficits related to the claimant's hearing loss." R at 449.  This is also

supported by the fact that the ALJ did, in fact, account for any lingering symptoms of Plaintiff's hearing deficiency and sensitivity to loud noise by limiting Plaintiff's work "to areas where there is only light traffic and no more than moderate noise levels (e.g., business offices, department stores, and grocery stores)." R at 449.  Accordingly, the Court concludes that there was substantial evidence to show that the ALJ's determination of the physical RFC reasonably accounted for Plaintiff's credible physical symptoms.

B.  **Mental RFC**

The ALJ determined that accounting for Plaintiff's mental impairments—including her major depressive disorder, anxiety learning disorder, posttraumatic stress disorder, and panic disorder—she could "perform all exertional work involving understanding, remembering and carrying out simple work and adapt to routine workplace changes with occasional interaction with supervisors, coworkers and the general public." R. at 442.  The Court concludes that there is substantial evidence in the record to support the ALJ's findings.

Plaintiff has a long, documented history of mental impairments—stemming from custody battles over her son, an abusive relationship with her son's father, and financial difficulties-- that has been treated with medication and psychotherapy.  However, Plaintiff has been consistently found to be able to maintain her activities of daily living and a number of medical experts have supported her ability to work.  The ALJ put weight in the fact that it was well-documented that Plaintiff responded well to her medications off Zoloft and Klonopin and was able to perform activities that undercut her claim of disability.  For example, Plaintiff was able to take care of her child, clean, prepare meals, complete laundry, take public transportation, read, shop for food, go to the gym to work out, and plan a birthday party for her son, all suggesting that her mental impairments could be controlled, at least in part, with medication. R. at 450; *see Duran v. Colvin*,

No. 14-CV-4681, 2015 WL 4476165, *12 (S.D.N.Y. Jul. 22, 2015) (noting that the claimant's testimony undercut her allegations that she was disabled because she takes care of her children, prepares food daily, uses public transportation, attends church, and shops for groceries).

The ALJ next notes that Plaintiff not only receives treatment for her mental impairments, but that her treatment has included only conservative care including medication management and psychotherapy.  The record demonstrates that she responded well to both her medications of Zoloft and Klonopin, and a number of medical professionals recommended that she continue this treatment alongside psychotherapy, including Dr. John Miller, Dr. Moeed Ahmad, and Dr. Kenneth Kessler.  Moreover, the record indicates that Plaintiff responded well to these medications and that her symptoms would often worsen upon ceasing taking the medications. *See, e.g.*, R. at 1326, 1988, 2071, 2088, 2092.  The fact that Plaintiff's mental impairments are manageable with medication and psychotherapy further supports the ALJ's conclusion. *See Whipple v. Astrue*, 479 Fed. App'x. 367, 370 (2d Cir. 2012) (unpublished) (affirming conclusion of an ALJ that claimant was capable of returning to work in part because his "depression and anxiety were manageable with medication."); *see also Torres v. Colvin*, 13-CV-8224, 2015 WL 1218705, at *9 (S.D.N.Y. Mar. 17, 2015) (noting that claimant's symptoms "waxed and waned in reaction to personal stressors, but . . . [claimant] showed substantial improvement overall and was stable with conservative treatment such as medication but not hospitalization") (citation and quotation marks omitted).

Next, the ALJ put substantial weight in the opinion off Plaintiff's treating physician, Dr. Ahmad. *See Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)) ("[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'").   In an evaluation in November 2016, Dr. Moeed specifically noted that: Plaintiff "requested to have medical disability form signed as she states repeatedly 'I cannot work rite now.' However, patient was unable to provide a legitimate reason as to why she cannot work other than she is 'stressed' and 'just can't work.' Therefore, patient was NOT deemed to be unable to work at the present time." R. at 2086.   In December 2016, Dr. Moeed assessed Plaintiff and noted that "Patient does not appear to be overwhelmed, still maintains ADLs, mood symptoms do not seem to impede ADLs significantly." *Id.* at 2088.

These conclusions were supported by other medical experts including that of Dr. Michelle Marks, who noted that Plaintiff "retains the capacity to deal with routine changes in an ordinary work setting," *id.* at 694; Ms. Elizabeth Bergman, a licensed clinical social worker, who determined that Plaintiff has the ability to "understand and remember simple instructions," "carry out simple instructions," and "make judgments on simple work-related decisions," *id.* at 414; Dr. Alan Dubro, who noted that Plaintiff was capable of following, understanding and remembering simple instructions and directions, and that she was capable of low stress and simple tasks, *id.* at 1350; and Dr. Harding who noted that Plaintiff "retains the mental capacity for simple work," *id.* at 278.   These conclusions were also supported by the mental status exams performed by various health care providers that concluded that Plaintiff was in the normal to mild impairment range for affect, memory, speech, insight, orientation, and judgment. *See, e.g.*, *id.* at 1235-36; 1348-49; 2007.   This further supports the ALJ's conclusion that Plaintiff did not have any marked limitations. *See in Vazquez v. Commr. of Soc. Sec.*, 14-CV-6900, 2015 WL 4562978, at *11 (S.D.N.Y. July 21, 2015) ("[T]he ALJ observed that the January 2012 mental status exam findings were largely unremarkable, except for Dr. Martinez giving [claimant] a GAF score of 50."); *see*

25

also *Phoenix v. Colvin*, 14-CV-4164, 2015 WL 451016, at *19 (S.D.N.Y. Feb. 4, 2015) ("Dr. Harneja's mental status examinations repeatedly found that [claimant] essentially had normal memory, attention, reasoning and thought processes."). The testimony of these health care providers, alongside the results of Plaintiffs' mental status examinations, provides significant evidence to support the ALJ's conclusion that Plaintiff did not have any marked limitations. R at 451.[3]

Finally, the ALJ noted that "claimant betrayed no evidence of debilitating symptoms while testifying at the hearing," and that she "followed questioning from both her representative and the Administrative Law Judge, and responded appropriately." R. at 451. The ALJ is in a unique position to assess a claimant's credibility, particularly in light of their conduct and responses at a hearing. *See Stern v. Colvin*, 16-CV-4250, 2017 WL 10085603, at *9 (S.D.N.Y. July 28, 2017), *report and recommendation adopted*, 16-CV-4250, 2018 WL 3863448 (S.D.N.Y. Aug. 14, 2018) ("Finally, the ALJ pointed out that Plaintiff 'demonstrated no evidence of debilitating symptoms while testifying at the hearing,' although, the ALJ did acknowledge that this alone cannot be considered a dispositive indicator of Plaintiff's functionality on a daily basis."); *Milliner v. Berryhill*, 16-CV-5744, 2017 WL 3671521, at *5 (S.D.N.Y. July 31, 2017), *report and recommendation adopted*, 16-CV-5744, 2017 WL 3668994 (S.D.N.Y. Aug. 23, 2017) ("Although

---

[3] The Court pauses to briefly address the ALJ's determination about the weight assigned to Dr. Melissa Antiaris' opinion. Dr. Antiaris concluded that Plaintiff had a full scale IQ of 63, which was in the extremely low range. However, Dr. Antiaris herself noted that Plaintiff did not comply with the directions of the test and thus that the score "should be considered with caution." R at 2011-12. Moreover, Dr. Antiaris also concluded that Plaintiff's psychiatric concerns were not significant enough "to interfere with the claimant's ability to function on a daily basis," *id.* at 2013, and that "[t]here are no limitations in the claimant's ability to follow and understand simple directions and instructions, or perform simple tasks independently." *Id.* at 2008. Accordingly, the ALJ gave "some weight" to Dr. Antiaris' opinion given her expertise and evaluation of Plaintiff. R. at 449.

Milliner's behavior at the hearing could not be considered a conclusive indicator of her overall level of functioning on a day-to-day basis, the ALJ noted that it was permissible to consider the apparent lack of debilitating symptoms, among other factors, in reaching a conclusion concerning the credibility of the plaintiff's allegations.").

Taking this evidence into account—including Plaintiff's treatment records that showed improvements to her condition with medication, her extensive range of daily living activities, recent treatment notes from her treating physician, testimony from multiple health care providers that Plaintiff could engage in unskilled, simple, low-stress work; and relatively mild mental exam findings—the ALJ correctly concluded that Plaintiff "is mentally capable of performing substantially all unskilled jobs." R. at 452.  Specifically, the ALJ concluded that Plaintiff had the ability to understand instructions, respond to supervisors, and deal with changes in a routine work setting.  This is supported by the substantial evidence in the record, and a reasonable mind could accept this evidence as adequate to support the ALJ's conclusion.  Accordingly, the Court finds the ALJ's determination about Plaintiff's residual functional capacity to be supported by substantial evidence.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Judgment on the Pleadings is hereby **GRANTED**.  The Clerk is respectfully directed to close this case.

**SO ORDERED.**

Dated: September 30, 2020
      New York, New York

_____
      **ANDREW L. CARTER, JR.**
      **United States District Judge**